UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DOUGLAS WAGNER,

        Plaintiff,

    v.

CSX TRANSPORTATION, INC.,

        Defendant.

20-CV-1314-LJV-MJR
DECISION & ORDER

On September 16, 2020, the plaintiff, Douglas Wagner, commenced this action under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* ("FELA"). Docket Item 1. Wagner was employed by the defendant, CSX Transportation, Inc. ("CSXT"), at the time of the incident at issue here. *Id.* He alleges that he suffered injuries caused by CSXT's negligence when he climbed a ladder propped up against a utility pole and the pole fell. *Id.*

On November 23, 2020, CSXT answered the complaint. Docket Item 8. On December 3, 2020, the case was referred to United States Magistrate Judge Michael J. Roemer under 28 U.S.C. § 636(b)(1)(A). Docket Item 9. After the parties engaged in extensive discovery,[1] on May 31, 2022, CSXT moved for summary judgment. Docket Item 29. On August 1, 2022, Wagner responded, Docket Item 32; on September 1,

---

[1] *See* Docket Item 29-8 at 3 ("The parties have completed written discovery, including the exchange of [i]nterrogatories and document production. In addition to the plaintiff's sworn deposition testimony, nine depositions of CSXT witnesses have been completed.").

2022, CSXT replied, Docket Item 37; and on December 21, 2022, this Court head oral argument, *see* Docket Item 40.

For the following reasons, CSXT's motion for summary judgment is denied.

## **BACKGROUND**[2]

When utility poles are in use, they are connected by cables that run from one pole to the next.  *See* Docket Item 29-3 at 18-19.  But when the poles are "retired," the cables are taken down and the poles are removed from the ground.  *See* Docket Item 29-2 at 91; Docket Item 29-3 at 23.

Sometime before February 5, 2019, the 7Z11 Signal Team (the "Signal Team")—one of CSXT's railroad signal construction teams—removed the cables from the utility poles of the Niagara subdivision in Niagara Falls, New York.  Docket Item 29-7 at ¶¶ 2, 20; Docket Item 32-13 at ¶¶ 2, 20.[3]  To remove the cables, the Signal Team cut the bolts that held the cables in place and "let the cable[s] drop and slap" on the ground.  Docket Item 29-3 at 19.  According to Chuck McLaughlin, the Signal Team's foreman, Docket Item 29-7 at ¶ 4; Docket Item 32-13 at ¶ 4, allowing the cables to fall tested the poles' stability because the falling cable "would rock the poles back and forth, and if

---

[2] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party.  *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The following facts are taken from CSXT's statement of undisputed facts, Docket Item 29-7; Wagner's statement of undisputed facts, Docket Item 32-13; and the exhibits incorporated in the parties' filings.  They are viewed in the light most favorable to Wagner.

[3] Wagner was not then a member of the Signal Team and did not participate in that work.  Docket Item 29-2 at 157; Docket Item 32-13 at ¶ 20.

there was a problem or issue with anything, it would have showed up then," Docket Item 29-3 at 19-20.

Foreman McLaughlin explained that in addition, "once you take the cables off, there's nothing else to support [the poles]," so poles that remain standing after their cables are removed should be stable. *Id.* at 20. Signal Team members also visually inspected the poles, Docket Item 29-4 at 12, and "hand rock[ed]" them by "hammering out the bolts that were in them," Docket Item 29-3 at 20-21. McLaughlin thought that testing the poles using these methods "was the safest way to go." *Id.* at 20.

On February 5, 2019, the Signal Team returned to the Niagara subdivision to remove the poles from the ground. Docket Item 29-7 at ¶¶ 1-2; Docket Item 32-13 at ¶¶ 1-2. On that day, the Signal Team had five members: Wagner; McLaughlin; Gary Holland, the boom truck and crane operator; Travis Osantoski, the backhoe operator; and Matt Schall, who assisted Holland by maneuvering the boom. Docket Item 29-7 at ¶¶ 3-10; Docket Item 32-13 at ¶¶ 3-10. Wagner's "job duties involved placing a sling around each pole," which was then attached to the boom and used to lift the pole out of the ground. Docket Item 29-7 at ¶ 10; Docket Item 32-13 at ¶ 10. Wagner "carr[ied] a 20-foot extension ladder from pole-to-pole[, ]lean[ed] it against each pole," climbed the ladder with the sling over his shoulder, and then attached the sling to the pole. Docket Item 29-7 at ¶¶ 12-14; Docket Item 32-13 at ¶¶ 12-14.[4]

---

[4] Although none of the Signal Team members had removed utility poles in their work for CSXT before February 5, 2019, Docket Item 32-13 at ¶ 9 (citing Schaal's, Holland's, and Osantoski's depositions), Wagner had prior experience using slings to perform other tasks, Docket Item 29-2 ("[I]n signal construction we use slings all of the time . . . for just about everything."); Docket Item 29-7 at ¶ 11; Docket Item 32-13 at ¶ 11.

3

Wagner placed slings on five or six poles without any problem. Docket Item 29-2 at 127-28. And when he first placed the ladder against the next pole and began to climb it, the ladder and the pole seemed stable. *Id.* at 136. But once Wagner was at the height where he "was about to put th[e] sling on," the pole "started to sway" and he "knew it was coming down." *Id.* at 137. As the pole fell forward, Wagner "jumped off" the ladder backward, landed on his feet, and then fell to the ground. *Id.* at 137-39.[5] He "felt like the air got knocked out of [him]," *id.* at 141, but "[e]ventually" stood back up, continued working, and placed slings on several more poles even though he was "hurting," *id.* at 147-48.

None of the Signal Team members could say for certain why the pole fell. *See* Docket Item 29-3 (McLaughlin's deposition); Docket Item 29-4 (Holland's deposition); Docket Item 29-5 (Osantoski's deposition); Docket Item 29-6 (Schaal's deposition). The end of the pole that had been in the ground appeared "notched," Docket Item 29-3 at 49-50 (also noting that the pole "didn't look right"), "tapered," *id.*; Docket Item 29-4 at 19-20; Docket Item 29-5 at 9-10, or "chiseled," Docket Item 29-6 at 11, but the Signal Team members were not able to explain why or how the end of the pole became like that. Docket Item 29-3 at 50 (McLaughlin's confirmation that he did not know "how [the pole] got like that"); Docket Item 29-4 at 20 (Holland's confirmation of the same); Docket Item 29-5 at 9-10 (Osantoski's confirmation of the same); Docket Item 29-6 at 11 (Schaal's confirmation of the same).

---

[5] The height from which Wagner jumped is unclear. *Compare* Docket Item 29-2 at 136 (Wagner's estimate that he was standing on "at least the eighth" rung of the ladder when the pole fell), *with* Docket Item 29-3 at 57 (McLaughlin's statement that when he asked Wagner how high he was on the ladder when the pole fell, Wagner pointed to the "third run[g] up").

4

Wagner hypothesized, however, that the pole "probably broke a long time ago" and was replaced in the ground without being fixed. Docket Item 29-2 at 162-65. He suggested that after the base of the pole broke, someone "stuck [the broken] pole on top of" the piece of the pole that remained in the ground, "put a piece of rubber down there to hold it together[,] and filled it in with stone." *Id.* Wagner based this theory on what he and the other Signal Team members saw and discussed when they looked at the pole after Wagner fell, *id.* at 164-66 (confirming that the Signal Team members "all observed and talked about that as the reason why the pole fell"), and on a photograph of the pole, *id.* at 162-63.

On September 16, 2020, Wagner filed a complaint alleging that CSXT violated FELA in numerous ways, including by failing to provide Wagner with a reasonably safe place to work, failing to inspect Wagner's work area, and failing to ensure that the pole was secure before directing Wagner to climb the ladder. Docket Item 1 at ¶ 15. Through these failures, Wagner alleges, CSXT "negligently failed and neglected to enact and enforce safety rules, regulations, procedures, and practices for activities carried out by its personnel." *Id.* As a result, Wagner says, he suffered "severe and disabling injuries" to his back, elbow, knees, feet, ankles, arm, rib, groin, and legs. *Id.* at ¶¶ 11-12, 15.

## **LEGAL STANDARD**

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). "Summary judgment is appropriate when 'there can be but one reasonable

5

conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant." *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)).  Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party."  *Id.*  "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence."  *Id.*

## DISCUSSION

**I.    FELA**

FELA is "'a broad remedial statute' whose objective is 'to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer.'"  *Green v. Long Island R.R. Co.*, 280 F.3d 224, 229 (2d Cir. 2002) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561-62 (1987)).  It provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of . . . such carrier."  45 U.S.C. § 51.

A plaintiff asserting a claim under FELA "must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation."  *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006).  But the Second Circuit "applies 'a relaxed standard of negligence' in FELA cases."  *Hewitt v. Metro-N. Commuter R.R.*, 244 F. Supp. 3d 379, 384 (S.D.N.Y. 2017) (quoting *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999)).  "[A]n employer breaches its duty under FELA 'if it

6

knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees.'" *Williams*, 196 F.3d at 406 (quoting *Ulfik v. Metro-N. Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996)). In other words, an employer is liable under FELA if the evidence "justif[ies] with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury." *Id.* at 406-07 (quoting *Ulfik*, 77 F.3d at 58). Nevertheless, "FELA is not a strict liability statute," and FELA claimants "must at least offer some evidence that would support a finding of negligence." *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 700 (2d Cir. 2010) (summary order) (first quoting *Williams*, 196 F.3d at 406, then quoting *O'Hara v. Long Island R.R. Co.*, 665 F.2d 8, 9 (2d Cir. 1981)).

In FELA cases, "the right of the jury to pass on factual issues must be liberally construed," and judgment as a matter of law is appropriate only "where reasonable jurors could reach only one conclusion." *Williams*, 196 F.3d at 407 (citation and internal quotation marks omitted). Under this strict standard, an FELA case "must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff." *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 828 (2d Cir. 1994); *see, e.g.*, *Krause v. CSX Transp.*, 984 F. Supp. 2d 62, 82 (N.D.N.Y. 2013) (denying the defendant's motion for summary judgment based on a question of fact as to whether the "failure to allow an employee to take a lunch break creates an unsafe working condition"); *McWatt v. Port Auth. Trans-Hudson Corp.*, 2015 WL 12559894, at *6 (S.D.N.Y. Mar. 20, 2015) (denying the defendant's motion for summary judgment based on a question of fact as to whether the defendant informed the plaintiff "of the existence or location of [a] ladder and step" that could be used "to access the

[train] track bed" into which the plaintiff jumped); *Bartnick v. CSX Transp., Inc.*, 2014 WL 823421, at *1-*3 (N.D.N.Y. Mar. 3, 2014) (denying the defendant's motion for summary judgment because there were "questions of fact as to the reasonableness of [the defendant's] actions under the circumstances" where the plaintiff alleged that he slipped on a broken piece of blacktop obscured by snowfall).

## II.     FORESEEABILITY

To recover under FELA, a claimant must prove that the harm he suffered was reasonably foreseeable by his employer. *See Gallick v. Baltimore & O.R. Co.*, 372 U.S. 108, 117 (1963) ("[R]easonable foreseeability of harm is an essential ingredient of [FELA] negligence."); *see also CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011). If an employer "has no reasonable ground to anticipate that a particular condition would or might result in a mishap and injury, then the party is not required to do anything to correct the condition." *McBride*, 564 U.S. at 703 (quoting *Gallick*, 372 U.S. at 118 n.7) (alterations omitted). Thus, an employer is not required to anticipate an unforeseeable danger or hazard. *See Lyman*, 364 F. App'x at 701 ("Reasonable care is determined in light of whether or not a particular danger was foreseeable." (quoting *Syverson*, 19 F.3d at 826)). Reasonable foreseeability "requires proof of actual or constructive notice to the employer of the defective condition that caused the injury." *Sinclair v. Long Island R.R.*, 985 F.2d 74, 77 (2d Cir. 1993); *see also Higgins v. Consol. Rail Corp.*, 451 F. App'x 25, 26 (2d Cir. 2011) (summary order).

CSXT says that it could not have foreseen the injury that Wagner suffered. Docket Item 29-8 at 13-24. More specifically, CSXT argues that it was not negligent because it had neither actual nor constructive knowledge of the allegedly damaged

pole, making Wagner's injuries not reasonably foreseeable. *Id.* But this Court finds that Wagner has provided sufficient evidence for a jury to reasonably conclude that Wagner's injury was reasonably foreseeable.

### A.   Actual Knowledge

"A defendant has actual notice [of a dangerous condition] if [the defendant] either created the condition or received reports of it such that [the defendant] is actually aware of the existence of the particular condition." *DeFilippo v. Nat'l R.R. Passenger Corp.*, 2019 WL 3531761, at *7 (S.D.N.Y. Aug. 2, 2019) (citation omitted).

CSXT argues—correctly—that there is "no evidence that CSXT (or anyone at all) had actual notice of the [pole's] alleged defect." Docket Item 29-8 at 21. Wagner does not claim that he or anyone else knew of the alleged defect, let alone reported it to CSXT. *See* Docket Items 1, 29-2, and 32. And his testimony establishes that the alleged defect was not visible because it was below ground-level before the pole fell. Docket Item 29-2 at 169-70 (confirming that the "broken portion" of the pole "was beneath ground").

A jury therefore could not reasonably find that CSXT had actual knowledge of the pole's condition.

### B.   Constructive Knowledge

Generally, "[t]o constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit [the defendant] to discover and remedy it." *Robinson v. Wal-Mart Stores, Inc.*, 242 F.3d 367 (2d Cir. 2000) (summary order) (citation omitted). "A general awareness that a dangerous condition may be present is not enough to establish liability." *Id.* (citation

9

omitted); see, e.g., *Coale v. Metro-N. Commuter R.R. Co.*, 621 F. App'x 13, 14-15 (2d Cir. 2015) (summary order) (concluding that "an oily, shiny substance on the floor" was not a hazard that was "so obvious and persistent in nature" that the defendant had constructive notice of it). Rather, there must be some basis for concluding that the defendant "should have known" about the defect. *See Piroscafo v. Metro-N. Commuter R.R. Co.*, 552 F. App'x 6, 8 (2d Cir. 2013) (summary order) ("There is a similar lack of evidence that Metro-North had constructive knowledge—*i.e.*, that it should have known—of the icy conditions.").

But an employer "may be charged with constructive notice of a defective condition on a 'failure[-]to[-]inspect' theory" when "the defective condition could have reasonably been discovered, but was not discovered due to the [employer's] failure to inspect the relevant work area." *Paul v. Genesee & Wyoming Indus., Inc.*, 93 F. Supp. 2d 310, 319 (W.D.N.Y. 2000) (citing *Sinclair*, 985 F.2d at 77). In those cases, the condition must be discoverable upon a "reasonable inspection." *Robinson v. Del. & Hudson Ry. Co., Inc.*, 2010 WL 11680177, at *4 (N.D.N.Y. Jan. 25, 2010) (finding that a "reasonable inspection" would have revealed the condition of which the plaintiff complained); see also *Plagianos v. Am. Airlines, Inc.*, 912 F.2d 57, 59-60 (2d Cir. 1990) (evaluating whether, under FELA, a jury could find that an employer's inspection was "reasonably prudent"); *McNeill v. Town of Islip*, 203 A.D.3d 813, 815, 160 N.Y.S.3d 900, 901-02 (2d Dep't 2022) (holding that "the mere presence of rust on [a] pole, standing alone, was insufficient to establish that the [defendant] had constructive notice of the alleged defect" because there was no evidence that a reasonable inspection would have revealed the alleged defect).

Because the allegedly damaged portion of the pole was below ground-level and was not visible to the naked eye, Docket Item 29-2 at 169-70, CSXT is correct that the defect was not "visible and apparent," see Wal-Mart, 242 F.3d at 367, and CSXT did not have constructive notice on that basis. But CSXT may have had constructive notice of the condition if a reasonable inspection would have revealed the pole's alleged defect, and the parties dispute whether CSXT's inspection—which did not reveal the alleged defect—was reasonable.

### 1.     The Pole-Climbing Training Document

Wagner bases his failure-to-inspect argument on a CSXT training document called "G001C, Pole Climbing" that Wagner says CSXT issued in 1996 and revised in 2012. See Docket Item 32 at 2-7. That document identifies various "hazards" associated with pole climbing, including "[p]ole condition" and the risk of "[p]ole[s] breaking or falling down due to [a] broken, rotted[,] or hollow base below grade level." Id. at 6. It instructs pole climbers to inspect the base of a pole by: (1) "[s]trik[ing] the pole sharply with a hammer weighing approximately 3 pounds . . . starting at the ground line and continuing upwards around the pole to a height of approximately 6 feet" to locate "[d]ecay pockets"; (2) "[r]ock[ing] [the] pole at right angles . . . using mechanical means" to "ensure [the pole] is sound"; and (3) "[w]hen in doubt" about the pole's stability, "remov[ing] 18 inches of soil from around [the] base on one side to ensure [there is] no decay below ground level." Id. at 6-7. Neither Wagner nor any other Signal Team member were trained to inspect poles using these methods. Id. at 7.[6]

---

[6] Wagner's response asserts a failure-to-train claim that is not included in his complaint. Docket Item 32 at 18. But as CSXT notes, "a party may not raise new claims for the first time in opposition to summary judgment." Docket Item 37-5 at 2

11

CSXT says that these guidelines apply only to "pole line[men]"—not to the Signal Team's work on February 5.  *See* Docket Item 37-5 at 2-5.  According to CSXT, a pole lineman is "someone who performs skilled work installing and maintaining electrical transmission systems, sometimes while strapped at height to a utility pole."  *Id.* at 3. Pole linemen "pole climb[]" when they "ascend[] or descend[] wooden poles" and "work[] while fastened to a pole."  *Id.* at 3-4.  CSXT says that pole climbing "is distinct from what Wagner was doing[ on February 5]: using a ladder."[7]  *Id.* at 5.  And, it adds, it has different "safety rules that specifically govern the use of ladders"—rules that applied to Wagner's work on that day.  *Id.* at 4.

Even viewing the facts in the light most favorable to Wagner, he clearly was not pole climbing when he climbed a ladder leaned against a pole.  So it is fair to say, as CSXT argues, that the pole-climbing safety inspection guidelines did not apply to Wagner's work on February 5.  *See id.*  But that does not mean that the document is irrelevant.

In fact, the pole-climbing document is evidence that CSXT was aware of the risk that a utility pole might not support a worker's weight.  And if that is true, then it stands to reason that a pole might fall when leaned upon with enough weight or force.  Perhaps the document evidences only CSXT's "general awareness" that utility poles may be

---

(quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010)). Wagner's failure-to-train claim therefore fails, although his FELA action survives on other grounds.

[7] Holland's testimony further illuminates the difference between working as a signalman—his and Wagner's positions with CSXT—and working as a pole lineman. Before joining CSXT, Holland worked as a pole lineman in the army.  Docket Item 32-10 at 10-11.  He received specific training to perform the tasks that role required, but he did not use that training in his work as a signalman for CSXT.  *Id.* at 6, 10-11.

unstable. *See Wal-Mart*, 242 F.3d at 367. But the reasonableness of CSXT's inspection of the poles the Signal Team removed on February 5 is nevertheless colored by that document, which certainly provides some evidence of what CSXT knew about the stability of utility poles. *See Gallick*, 372 U.S. at 118 (referring to a jury instruction stating that a "defendant's duties are measured by what is reasonably foreseeable under like circumstances . . . in the light of the facts then known").

### 2. The Reasonableness of CSXT's Inspection

CSXT argues that it cannot be held liable for failing to inspect because the Signal Team inspected the poles that it removed on February 5—including the pole that fell. Docket Item 29-8 at 22-23.[8] CSXT observes that the alleged defect was not revealed by any of the Signal Team's inspection methods, including the "drop and slap" method, where the falling cables "shock[ed]" the poles and caused them to "vibrat[e] and rock[] back and forth"; "'hand rock[ing]' each pole"; and visually inspecting each pole. *Id.*

Moreover, CSXT says that its inspection was indeed reasonable. It argues that several Signal Team members described the "drop and slap" method as "the safest way to identify any poles that were loose or unstable." *Id.* at 22. It notes that there is no evidence suggesting that "more comprehensive inspections and testing would have been reasonable." *Id.* at 23. And it observes that even Wagner himself thought that the

---

[8] CSXT also argues that "there is no evidence as to why the pole broke," Docket Item 29-8 at 20-21, but that argument is a red herring. As long as a reasonable inspection would have revealed the pole's alleged defect, CSXT may be liable for its failure to inspect and discover the alleged defect regardless of the nature or cause of that defect. And it is reasonable to assume that had the Signal Team found a defect, the team members would have ensured that the pole could support the ladder before Wagner climbed it.

13

poles had been adequately inspected.  *Id.* (noting that Wagner did not feel the need to test the poles himself beyond performing a "visual inspection" and that he later stated that he "would imagine" that the process of removing the cables would have knocked down any unstable poles (citing Docket Item 29-2 at 159-61, 169-71)).[9]

Wagner counters that what he thought has no bearing on the reasonableness of CSXT's inspection; he notes that he "had no prior experience removing utility poles," that he was not present when the Signal Team removed the cables from the poles, and that he incorrectly believed that the cables had been "ripped" off the poles with a backhoe.  Docket Item 32 at 9; *see also* Docket Item 29-2 at 167-69 ("Well, if a backhoe came by and ripped the wires right off of it and the pole is standing, what would I be inspecting it for?").  Moreover, he says that he later learned that many of the poles were "never subjected to any 'shock' at all."  Docket Item 32 at 9.[10]  And he argues that CSXT

---

[9] Although Wagner characterizes this as an assumption-of-the-risk argument, Docket Item 32 at 15-17, CSXT does not argue that Wagner assumed any risk by inspecting or failing to inspect the pole himself.  Rather, it argues that Wagner's belief that the pole was sturdy confirms that CSXT did not have constructive notice of any defect and performed a reasonable inspection.  Docket Item 29-8 at 22-23.

[10] Wagner is referring to Holland's description of the "drop and slap" cable removal process:

> Oh, we would just skip every other pole as we were cutting down the wire. . . . So . . . pole number one we would cut down.  We would leave the wire attached to pole number two, okay.  Cut number three.  Then we would come back to pole number two and cut that down.  So [the cable] would just fall down, straight on down.

Docket Item 29-4 at 11.  Although CSXT argues that there is "no dispute" regarding the "nature and extent" of its inspection of the poles, Docket Item 29-8 at 19, Wagner contests the amount of stress or "shock" to which the poles were subjected.  That alone may create a material issue of fact that precludes summary judgment, but this Court need not consider that possibility because it finds that summary judgment is inappropriate for other reasons.

"failed to follow its own procedures for inspecting a pole before it is climbed" by not using the inspection methods described in the pole-climbing document.  *Id.* at 7.

This Court agrees with Wagner.  Even if the pole-climbing document shows only a "general awareness" of the risk of unstable poles, *see Wal-Mart*, 242 F.3d at 367, a reasonable juror could conclude that such an awareness should have informed CSXT's procedures for inspecting poles that its workers used to support ladders.  *See Gallick*, 372 U.S. at 118.  CSXT instructed its pole climbers to take specific steps to ensure that utility poles would not fall when climbed.  *See* Docket Item 32 at 2-7.  And a reasonable jury might well conclude that those same precautions should have been taken by workers who used poles to support ladders that they climbed.

CSXT argues that "the safety inspections necessary for someone climbing and working while fastened to a pole" differ from the precautions required when a worker climbs a ladder leaned against a pole.  Docket Item 37-5 at 2-5.  And perhaps a jury will accept the argument that pole climbing, which requires that a pole support the full weight of a climber, calls for more thorough testing than using poles to support ladders that workers climb, which does not.  But it is certainly possible that a reasonably prudent employer who knows that utility poles may fall when used for support would subject all such poles to a more thorough inspection than CSXT performed, and a jury may find that as well.

CSXT also argues that there is no evidence suggesting that "more comprehensive inspections and testing would have been reasonable."  Docket Item 29-8 at 23.  But Wagner has provided a document—CSXT's own document—that outlines "what kind of inspection would have been reasonable."  *Cf. Van Gorder v. Grand Trunk*

15

*Western R.R., Inc.*, 509 F.3d 265, 270 (6th Cir. 2007) (rejecting the plaintiff's failure-to-inspect theory because the plaintiff "fail[ed] to point to any standard of care to which [the defendant] failed to conform" and "d[id] not explain what kind of inspection would have been reasonable"). So contrary to CSXT's argument, *see* Docket Item 37-5 at 10, Wagner is not making a conclusory statement that CSXT's inspection was not reasonable; in fact, he offers CSXT's own specific procedures that he says should have been used to inspect the pole that fell.[11]

Finally, CSXT makes much of the fact that the pole-climbing document—by its own terms—was not applicable here. Docket Item 37-5 at 2-6. But that misses the point. It is precisely because CSXT had a policy to prevent injuries like this in other contexts that there is a question about whether it should have employed that policy in this context. Stated more simply, CSXT clearly knew that poles might tip and it knew how to protect pole climbers from that hazard; the question is whether it should have protected Wagner from that very same hazard in the very same way.

In sum, a reasonable juror might well find that the inspection methods used to evaluate the stability of the poles in the Niagara subdivision fell below the standard of care that a reasonably prudent employer would exercise. And that is especially so because CSXT explicitly acknowledged that unstable utility poles may be a hazard in

---

[11] The pole-climbing document distinguishes this case from many of the cases that CSXT cites in support of its motion. For example, in *LeDure v. Union Pac. R.R. Co.*, 962 F.3d 907 (7th Cir. 2020), *aff'd*, 142 S.Ct. 1582 (2022), and *McNeill*, 203 A.D.3d 813, 160 N.Y.S.3d 900, the courts granted summary judgment to the respective defendants on the ground that in each case, a reasonable inspection would not have revealed the alleged defect. But the plaintiffs in those cases did not produce evidence suggesting that the defendants were aware of the risk of those alleged defects, let alone documents suggesting alternative inspection procedures.

other contexts and provided specific precautions to protect workers from that hazard. Therefore, "[e]xactly what [CSXT] knew or should have known, and whether [it] exercised reasonable care in light of its knowledge, are questions of fact upon which reasonable jurors could differ." See Paul, 93 F. Supp. 2d at 319-20 (quoting Sinclair, 985 F.2d at 77).

## **CONCLUSION**

Especially in light of the "strong federal policy in favor of letting juries decide FELA cases," O'Hara, 665 F.2d at 9, the questions of whether CSXT's inspection of the old utility poles was reasonable—and if not, whether a reasonable inspection would have revealed the pole's alleged defect—are for a jury to decide. For that reason, and for all the reasons stated above, the defendant's motion for summary judgment, Docket Item 29, is denied. **The parties shall contact the Court within 30 days of the date of this order to schedule a status conference to set a trial date.**

SO ORDERED.

Dated:  January 4, 2023
        Buffalo, New York

                                    /s/ Lawrence J. Vilardo
                                    LAWRENCE J. VILARDO
                                    UNITED STATES DISTRICT JUDGE